**UNITED STATES of America**

v.

**Eddie Lee ANDERSON, a/k/a Fast Eddie, Appellant.**

**No. 85–6173.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 13, 1988.

Decided June 24, 1988.

H. Fred Hoefle, Cincinnati, Ohio, for appellant.

Roy W. McLeese, III, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., Michael W. Farrell, and Theodore A. Shmanda, Asst. U.S. Attys., were on the brief for appellee. Joseph E. diGenova, U.S. Atty.,[*] Washington, D.C., also entered an appearance for appellee.

Before WALD, Chief Judge, and BUCKLEY and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

Appellant Eddie Lee Anderson was convicted of nine violations of the Mann Act, 18 U.S.C. § 2421 (interstate transportation of females for prostitution) and ten violations of 18 U.S.C. § 2423 (interstate transportation of minors for prostitution). Anderson's appeal raises three issues: first, whether the district court properly denied Anderson's motion to suppress evidence seized in Atlantic City pursuant to a New Jersey state warrant and in Las Ve-

---

[*] At time of appearance.

gas, Nevada pursuant to a federal warrant; second, whether appellant was properly sentenced to consecutive prison terms for conduct that violated both § 2421 and § 2423; and third, whether it was reversible error for the district court to admit the "expert" testimony of Dr. Lois Lee, a government witness, on the *modus operandi* of pimps and on the pimp-prostitute relationship. For the reasons set forth below, we reject all three challenges and affirm appellant's conviction.

## I. BACKGROUND

In a 29–count indictment filed on May 9, 1985, appellant Anderson was charged with transporting females in interstate commerce for prostitution, 18 U.S.C. § 2421, transporting minors in interstate commerce for prostitution, 18 U.S.C. § 2423,[1] inducing a female to engage in prostitution, D.C. Code § 22–2705, and obstructing justice, 18 U.S.C. § 1503. The indictment alleged that appellant, in ten different "transportations" occurring between July 1980 and October 1984, moved a "circuit" of females, including juveniles, across state lines for the purpose of prostitution. *See United States v. Anderson,* 618 F.Supp. 1335, 1336 (D.D.C.1985).

Prior to trial, the defense filed a motion to suppress evidence obtained pursuant to two search warrants—one issued by a judge of the New Jersey Superior Court authorizing the search of a motel room in Atlantic City, and the other issued by a federal magistrate authorizing the search of an apartment in Las Vegas, Nevada. *See id.* at 1336–37. Anderson contended that the evidence seized on December 7, 1984 in Atlantic City was inadmissable because (1) the warrant for the search did not specify on its face the items to be seized and therefore was invalid as a "general warrant" and (2) although circumstances required a federal warrant, this one was neither issued nor executed in conformity with Federal Rule of Criminal Procedure 41 in that it alleged only a violation of state

law and provided, without reasonable cause, for nighttime execution only. *See id.* at 1338–39. As to the federal warrant issued in the District of Nevada, Anderson contended (1) that it also violated the federal prescription against general warrants and (2) that the underlying affidavits were tainted and therefore invalid to the extent that they were based on the illegal seizure in Atlantic City. *See* Motion to Suppress Evidence at 6 (June 28, 1985).

The district court agreed with appellant that the warrant for the Atlantic City search was facially deficient because it failed to particularize the items to be seized. The trial court concluded, however, that the exclusionary rule should not apply because there was an objectively reasonable basis for the officer's mistaken belief that the warrant was valid. See 618 F.Supp. at 1340–42 (citing *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984)). The district judge also concluded that because the New Jersey warrant was a state warrant, "there [was] no necessity that it comply with the requirements of Rule 41." *Id.* at 1339. Finally, the trial court concluded that the Nevada warrant identified with adequate specificity the items to be seized and, moreover, that appellant's motion to suppress the evidence seized in Las Vegas lacked merit to the extent that it was based upon the allegedly illegal Atlantic City search. Accordingly, the district court denied appellant's motion to suppress in its entirety. *See id.* at 1342.

At trial, the government's principal witnesses were five women who had been named as victims in the indictment. These women testified that they were prostitutes, that Mr. Anderson was their pimp, that he transported them and other women in interstate commerce as charged in the indictment and that many of the women who worked for appellant had been arrested for prostitution during the period covered by the indictment. *See, e.g.,* Transcript (Tr.) VI at 296–97, 324–28, 534. Several of the

---

**1.** Both § 2421 and § 2423 were amended by the Act of November 7, 1986, Pub.L. No. 99–628, § 5(b)(1), 100 Stat. 3511. All discussions of § 2421 and § 2423 in this opinion refer to the unamended versions of those sections that were in force at the time of Anderson's indictment.

government witnesses testified to beatings they either received from appellant or saw appellant give to others. *See, e.g., id.* at 291–92, 585–86, 904, 923–25, 943–44, 988–89. The government also called various police officers and the parents of some of the prostitute-witnesses.

Finally, the government's last witness was Dr. Lois Lee, a sociologist, who testified as an expert on the *modus operandi* of pimps and on the nature of the relationship between pimps and prostitutes. Dr. Lee testified, among other things, that prostitutes are typically vulnerable girls who become so financially and psychologically dependent on their pimps that they are unable to leave them even when beaten. *See, e.g.,* Tr. XIII at 175, 176–81. Dr. Lee also mentioned several ways in which the pimp-prostitute relationship might end, including the prostitute becoming pregnant, moving to another pimp, going on welfare, committing suicide, or being murdered by a customer. *See* Tr. XIV at 8–9.

The defendant's witnesses—which included Anderson himself as well as several young women listed as victims in the indictment—testified that Anderson was not a pimp but a professional gambler, who moved from city to city and who spent considerable time in the gambling casinos of Las Vegas and Atlantic City. The young women testified that although they knew appellant, they had never worked as prostitutes for him or given him money. When confronted on cross-examination with their earlier, contradictory testimony before the grand jury, several of the women claimed that they had been pressured by the government to testify falsely against Anderson. *See* Tr. XVII at 69, 76, 105–06. Anderson admitted that he knew, and had received love letters from, the government's witnesses who claimed they had worked as prostitutes for him. *See* Tr. XVIII at 118, 127.

The jury found appellant guilty of nine violations of 18 U.S.C. § 2421, ten violations of 18 U.S.C. § 2423, and one violation of D.C.Code § 22–2705. The jury acquitted appellant of the obstruction of justice charge.[2] On December 3, 1985, appellant received the following sentence: five years' imprisonment and a $5,000 fine for each of the violations of 18 U.S.C. § 2421, the prison terms to run concurrently; from one to five years' imprisonment and a $1,000 fine for the violation of D.C.Code § 22–2705, the prison term to run concurrently with the terms imposed for the violations of 18 U.S.C. § 2421; and ten years' imprisonment and a $10,000 fine for each of the violations of 18 U.S.C. § 2423, the prison terms to run concurrently with each other but consecutively with the other prison terms imposed. This appeal followed.

## II. The Fourth Amendment Issue

Appellant challenges the district court's refusal to suppress evidence seized pursuant to a state warrant issued by a judge of the New Jersey Superior Court for the search of a motel room in Atlantic City, and a federal warrant issued by a magistrate in the District of Nevada authorizing the search of an apartment in Las Vegas. *See* 618 F.Supp. at 1336–37. The district court's findings of fact, which Anderson does not challenge on appeal, are as follows. In late 1984, agents of the Federal Bureau of Investigation (FBI) and officers of the District of Columbia Metropolitan Police Department (MPD) were investigating allegations that appellant was transporting females, including minors, in interstate commerce for the purpose of prostitution. During the course of the investigation, Detective Joseph Haggerty of the MPD spoke with several women who claimed that they had worked as prostitutes for Anderson. These sources also informed Haggerty that appellant owned and kept his personal belongings at a certain condominium in Atlantic City. Based upon this information, Haggerty secured a

---

**2.** Prior to trial, the government elected not to proceed on five of the violations of 18 U.S.C. § 2421 and two of the violations of 18 U.S.C. § 2423. After the government presented its case-in-chief, appellant's motion for a judgment of acquittal was granted as to one other violation of 18 U.S.C. § 2423. A renumbered indictment was prepared, and the case was submitted to the jury on twenty-one counts. *See* Appellee's Brief at 2 n. 1.

federal warrant, dated December 7, 1984, which authorized a search of the Atlantic City condominium for items including "bank books, diaries of travel and other evidence of travel, receipts, photograph albums, and photographs of women involved in prostitution for [appellant]." *Id.* at 1337. When the officers attempted to serve the warrant later that day, however, they were informed that appellant had moved his possessions, and the warrant was never executed. *See id.* at 1337.

Upon returning to the offices of the Atlantic City Police Department, the officers were advised by a reliable source that appellant had moved himself and a large amount of personal property to Room 224 at the Village Motel in Atlantic City. Based on this information, Detective John Imfeld of the Atlantic City Police Department prepared an affidavit in support of an application for a state search warrant. Imfeld's affidavit related the earlier unsuccessful effort to execute the federal warrant, specifically recited the items listed in the federal warrant, and referred to the information about Anderson obtained by the police from four women who claimed they had worked as prostitutes for him. *See id.* at 1337–38. Haggerty, Imfeld, and another officer then applied to a New Jersey Superior Court judge for a state search warrant. The officers presented to the judge not only the state officer's affidavit, but also the (unexecuted) federal warrant issued earlier that day along with the underlying federal officers' affidavit. After reading these materials, the state judge issued a search warrant at approximately 7:30 p.m. on December 7, 1984. The warrant recited that "there had been and now is located [at Room 224 of the Village Motel] certain property used as a means of committing a misdemeanor in violation of the laws of the State of New Jersey to wit: Interstate transportation of persons for the purpose of prostitution, 2C:34–1(b) 5." Although the warrant authorized a search for "the above-described items and other associated paraphernalia," it failed to include any specific description of the items to be seized. The underlying affidavits were neither incorporated by nor attached to the

warrant. In addition, the warrant provided that it was to be executed within the next ten days between the hours of 7:30 p.m. and 6:00 a.m. Upon receipt of the warrant, the officers proceeded to the Village Motel and executed the warrant at approximately 8:00 p.m. The search took approximately thirty minutes. *See id.* at 1338; Tr. X at 128–130, 132.

A few months later, on February 1, 1985, agents of the FBI obtained a federal warrant from a magistrate in the District of Nevada authorizing the search of an apartment in Las Vegas. The affidavit prepared by FBI agent Roger Young in support of the warrant described Haggerty's investigation in detail and referred to the seizures made in Atlantic City. The Nevada warrant specifically identified the items to be seized, which included "concealed photographs, photo albums, evidence of travel, ... which are the fruits, instrumentalities and/or evidence of one or more violations of Title 18, United States Code, Sections 2421 and 2423 and Title 22, D.C.Code, Section 2705." District of Nevada Search Warrant at 1–2 (Feb. 1, 1985).

■ Anderson's first contention is that the district court should have suppressed the evidence obtained in Atlantic City because the warrant authorizing that search failed to specify the items to be seized. We disagree. Like the district court, we believe that the Supreme Court's holding in *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984), controls this case. In *Sheppard,* a police detective investigating a homicide received information that led him to seek a warrant authorizing the search of the defendant's home. In support of the warrant, the detective prepared an affidavit describing the specific items to be seized. Because it was a Sunday, the only warrant form the police could find was one ordinarily used for drug searches. Realizing that the warrant form had to be modified before it could be used to authorize the search requested in the affidavit, the investigating detective deleted the phrase "controlled substance" from the subtitle of the form. However, neither the detective nor the judge who issued the

warrant deleted the reference to "controlled substances" in the portion of the form "that, when signed, would constitute the warrant itself." *Id.* at 985, 104 S.Ct. at 3426. Nor was the warrant form ever altered so as to incorporate the affidavit. *See id.* at 986, 104 S.Ct. at 3426. After the judge signed the warrant, the detective who had prepared the affidavit left with both the warrant and the affidavit and, accompanied by other officers, executed the warrant; the search was limited to the items listed in the affidavit. *See id.* at 986–87, 104 S.Ct. at 3426–27. These items were introduced at trial and Sheppard was ultimately found guilty of murder.

The Supreme Court held that federal law did not require suppression of the seized evidence, because the officers believed that the warrant authorized the search they conducted, and, "there was an objectively reasonable basis for the officers' mistaken belief." *Id.* at 988, 104 S.Ct. at 3427. Specifically, the Court noted that the investigating detective had taken "every step that could reasonably be expected of him": he had prepared a particularized affidavit, which was approved by the District Attorney, and he had presented the affidavit to a neutral judge, making it clear that the warrant form had to be modified; he was then informed by the judge that the search would be authorized and that the necessary changes in the warrant would be made. *Id.* at 989, 104 S.Ct. at 3428. At that point, the Court reasoned, "a reasonable police officer would have concluded, as [the detective] did, that the warrant authorized a search for the materials outlined in the affidavit"; therefore, suppression would not "serve the deterrent function that the exclusionary rule was designed to achieve." *Id.* at 989, 991, 104 S.Ct. at 3428.

We agree with the trial court that there is "little or no distinction between the facts in *Sheppard* and those in this case." 618 F.Supp. at 1341. Here, Detectives Haggerty and Imfeld were "involved in a lengthy investigation concerning the defendant's alleged illegal activities" when they received information that eventually led them to seek a warrant authorizing a search of the Village Motel room. *Id.* In this case, as in

*Sheppard,* the affidavit prepared in support of the state warrant specified in detail the items to be seized—although the affidavit was not attached to or incorporated by the warrant; the investigating officers presented the affidavit to a neutral judge, along with the affidavit submitted earlier in support of the federal warrant; the search was executed by the same officers who had prepared the affidavits; and the scope of the search was limited to the items listed in those affidavits. Given the similarity in all material respects of the situation here to that in *Sheppard,* we agree with the district court that Haggerty, Imfeld and the other investigating officers had an "objectively reasonable basis" for their mistaken belief that their search of the Village Motel room was authorized by a valid warrant.

■ Appellant's second argument is that the evidence seized in Atlantic City should have been excluded because the warrant authorizing the search failed to comply with Federal Rule of Criminal Procedure 41. The district court rejected this claim, relying on *United States v. Krawiec,* 627 F.2d 577 (1st Cir.1980), to hold that because the warrant was obtained by a state officer and recited only a violation of state law, "the warrant in question [was] a state warrant and [there was] no necessity that it comply with the requirements of Rule 41." 618 F.Supp. at 1339. As the government itself concedes, however, *Krawiec* does not govern this case. *See* Appellee's Brief at 27–28. Under the law of this Circuit, it is clear that the level of federal involvement in the Atlantic City search was such that a federal warrant ought to have been obtained. *See United States v. Haywood,* 464 F.2d 756, 760 (D.C.Cir.1972) (a search conducted by District of Columbia police which yielded evidence examined by federal experts and used in a federal trial was "federal" for purposes of Rule 41); *Waldron v. United States,* 219 F.2d 37, 39–40 (D.C.Cir.1955) (search is federal for fourth amendment purposes if a federal official "had a hand in it"). We therefore conclude, contrary to the trial court, that Rule

41 was applicable to the Atlantic City search.

■ We now consider whether the particular deviations from Rule 41 that occurred in the Atlantic City search justify suppression of the evidence seized. The government concedes that the New Jersey warrant failed to comport with the requirements of Rule 41 in two respects: it authorized a nighttime search without reasonable cause, and it failed to state a violation of federal law. *See* Appellee's Brief at 28–29. The government claims, however, that these were only technical defects, which do not call for exclusion of the evidence produced by the search. We agree. While it is true that the state warrant improperly authorized a nighttime search, in actual fact that Atlantic City search took place from approximately 8:00 to 8:30 p.m., which is considered daytime for the purposes of Rule 41.[3] Furthermore, although the warrant specified only a violation of state law, the conduct described in the warrant and in the underlying affidavit (interstate transportation of women for prostitution) plainly constituted a violation of federal law (18 U.S.C. § 2421); the officers had already obtained a federal search warrant on the basis of the same information earlier that day. The technical defects in the New Jersey warrant did not implicate in any way the essential requirements for a valid federal search warrant.

The Supreme Court has made clear "that technical defects in a warrant do not call for or permit exclusion of what the search produces." *United States v. Hornick,* 815 F.2d 1156, 1158 (7th Cir.1987) (citing *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)). Moreover, numerous federal decisions dealing with similar fact situations confirm that the particular "foibles in the administration of Rule 41" that occurred in this case are not grounds for suppression. *See, e.g., Hornick,* 815 F.2d at 1158 (the fact that federal warrant was authorized by a state rather than federal judge did not call for exclusion of evidence seized); *United States v. Comstock,* 805 F.2d 1194, 1200 (5th Cir.1986),

*cert. denied,* — U.S. —, 107 S.Ct. 1908, 95 L.Ed.2d 513 (1987) (suppression not called for even though "search warrant was not issued by court of record as required by Rule 41(a)"); *United States v. Searp,* 586 F.2d 1117, 1122 (6th Cir.1978); *cert. denied,* 440 U.S. 921, 99 S.Ct. 1247, 59 L.Ed.2d 474 (1979) (suppression of evidence was not justified despite the fact that the warrant, in violation of Rule 41, did not authorize a night search and the affidavit "disclose[d] no facts which would justify such a search"); *United States v. Ravich,* 421 F.2d 1196, 1200–02 (2d Cir.), *cert. denied,* 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970) (same); *United States v. Ritter,* 752 F.2d 435, 440–41 (9th Cir.1985) ("purely technical violation of Rule 41 does not require the suppression of evidence"); *United States v. Burke,* 517 F.2d 377, 381–82 (2d Cir.1975) (exclusion not required even though Rule 41 was not complied with in that the warrant was not directed to federal officers, did not require search within ten days, and did not designate a federal magistrate to whom return should be made). In accordance with the weight of relevant authority, we uphold the district court's determination that the defects in the warrant authorizing the Atlantic City search were technical in nature and thus did not entail suppression of the evidence obtained.

Finally, we affirm the decision of the trial court not to exclude the evidence seized in Las Vegas, Nevada. Like the district court, we find, contrary to appellant's assertion, that the Nevada warrant listed with adequate specificity the items to be seized in Las Vegas. And since we agree with the lower court that the evidence obtained pursuant to the New Jersey state warrant was admissible, we find no merit to appellant's assertion that the evidence seized in Las Vegas ought to have been excluded as the illegal "fruit" of the Atlantic City search.

### III. APPELLANT'S DOUBLE JEOPARDY CHALLENGE

■ The indictment against appellant alleged ten different trips, on which he pur-

---

**3.** Rule 41 defines "daytime" as 6:00 a.m. to 10:00 p.m. local time. FED.R.CRIM.P. 41(h).

portedly moved various females, including minors, across state lines for the purpose of prostitution. The jury found Anderson guilty of nine violations of 18 U.S.C. § 2421 and ten violations of 18 U.S.C. § 2423. The district court sentenced Anderson to five years for transporting females in violation of § 2421 and to ten years for transporting individuals under the age of 18 in violation of § 2423—the five and ten year terms to be served consecutively. On appeal, Anderson argues that each of his ten trips constituted a single transaction, and that the trial court, in sentencing him to consecutive prison terms for his violations of § 2421 and § 2423 on each trip, violated his fifth amendment right against multiple punishment for the same offense. We agree with appellant that each of his trips constituted a single transaction, *see Bell v. United States*, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955), but we reject appellant's claim that the Double Jeopardy Clause forbids separate punishments for conduct which violates both § 2421 and § 2423.

The Supreme Court has made clear that " '[w]here consecutive sentences are imposed at a single criminal trial, the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense.' " *Albernaz v. United States*, 450 U.S. 333, 344, 101 S.Ct. 1137, 1145, 67 L.Ed.2d 275 (1981) (quoting *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977)). Thus, " 'the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended,' " *Garrett v. United States*, 471 U.S. 773, 793, 105 S.Ct. 2407, 2418–19, 85 L.Ed.2d 764 (1985) (citation omitted); if Congress intended to impose multiple punishments, "imposition of such sentences does not violate the Constitution." *Albernaz*, 450 U.S. at 344, 101 S.Ct. at 1145, *quoted in Missouri v. Hunter*, 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983); *see also United States v. Coachman*, 727 F.2d 1293, 1298–99 (D.C.Cir.1984).

In ascertaining congressional intent, the court must look first to the language of the provisions at issue, to see whether Congress explicitly addressed the question of separate punishment. *See, e.g., Albernaz*, 450 U.S. at 336, 101 S.Ct. at 1140; *Coachman*, 727 F.2d at 1299; *cf. Missouri v. Hunter*, 459 U.S. at 368, 103 S.Ct. 679 (separate punishment of single transaction under two state statutes does not violate Double Jeopardy Clause where language of statutes made "crystal clear" that legislature intended separate punishment). "If the provisions are silent or ambiguous on the interaction of punishments, the court should explore the legislative history of each section for legislative intent respecting multiple punishments." *Coachman*, 727 F.2d at 1299. In the event that Congress' intent remains ambiguous, the court must resort to a rule of statutory construction derived from *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932): "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact the other does not." *Id.* at 304, 52 S.Ct. at 182; *see, e.g., Garrett*, 471 U.S. at 778–79, 105 S.Ct. at 2411; *United States v. Woodward*, 469 U.S. 105, 107–08, 105 S.Ct. 611, 612, 83 L.Ed.2d 518 (1985) (*per curiam*); *Albernaz*, 450 U.S. at 337–38, 101 S.Ct. at 1141. If, but only if, the legislative design remains obscure after application of the *Blockburger* rule, "the court should invoke the settled rule that ambiguity concerning the ambit of a criminal statute 'should be resolved in favor of lenity.' " *Coachman*, 727 F.2d at 1300 (citation omitted).

In this case, neither § 2421 nor § 2423 expressly addresses the question whether a single transaction violating both provisions should be separately punished. We turn, then, to the legislative history for insight into the problem. In our view, to the extent that the legislative history of the two statute suggests anything, it is that Congress enacted § 2421 and § 2423 to combat two quite "separate evils." *Woodward*, 469 U.S. at 109, 105 S.Ct. at 612. Nowhere in the legislative history of § 2421 and

§ 2423 is there any indication that cumulative punishment under the two sections was not intended. *See, e.g.,* 1978 U.S.Code Cong. & Admin.News 40–71. More significantly, § 2421 forbids the interstate transportation of females but does not similarly forbid such transportation of males; § 2421 thus seems to be directed at protecting females. *See Wyatt v. United States,* 362 U.S. 525, 530, 80 S.Ct. 901, 904, 4 L.Ed.2d 931 (1960) (" 'A primary purpose of the Mann Act was to protect women who were weak from men who were bad' ") (citation omitted). By contrast, § 2423, which extends to juveniles of both sexes, was designed to curtail "the increasing sexual exploitation of minors, both male and female, for commercial gain." *United States v. Parr,* 741 F.2d 878, 881 (6th Cir. 1984).

Application of the *Blockburger* rule to the provisions at issue here confirms that appellant was properly given separate punishments under each statute, since § 2421 and § 2423 each requires proof of a fact which the other does not: the requirement of § 2421 that the government prove that the persons transported were female does not appear in § 2423, while the requirement in § 2423 that the government prove that the persons transported were minors does not appear in § 2421. *See Parr,* 741 F.2d at 880 (*Blockburger* test suggests the appropriateness of multiple punishments under § 2421 and § 2423.).

Given that the application of the *Blockburger* rule to this case corroborates the indications in the legislative history that Congress enacted § 2421 and § 2423 to address two separate evils, we conclude that the trial court did not err in imposing on Anderson separate, consecutive sentences for single transactions that violated both § 2421 and § 2423.

## IV. THE ADMISSION OF DR. LEE'S TESTIMONY

Dr. Lois Lee, the government's expert witness, testified on the *modus operandi* of pimps and on the nature of the relationship between pimps and prostitutes. Specifically, Dr. Lee testified that sophisticated pimps usually travel in an intercity circuit with a group of ten to forty girls working for them; the recruits are usually vulnerable young women, often runaways who have been abused or neglected by their families. *See* Tr. XIII at 173–76, 179–80. According to Dr. Lee, the typical pimp will encourage his prostitutes to compete for his affection by earning money, and will beat his prostitutes if they fail to adhere to his rules. *See id.* at 181–83; Tr. XIV at 6. Dr. Lee described the prostitute-pimp relationship as a love-hate relationship, and noted that prostitutes are often so financially and psychologically dependent on their pimps that they are unable to leave even when they are beaten. *See* Tr. XIII at 180–181; Tr. XIV at 4–7. Pimps, Dr. Lee testified, usually spend the money earned by their prostitutes on drugs, clothes, and jewelry, since the ability to support a "flashy" lifestyle is a source of status in their subculture. *See* Tr. XIV at 7–9. Dr. Lee also mentioned several ways in which the pimp-prostitute relationship ends—the prostitute becomes pregnant, goes on welfare, turns to more serious kinds of crime, commits suicide, or dies at the hands of a customer. *See id.* at 8–9. In answer to a question by defense counsel during cross-examination about her qualifications, Dr. Lee stated that she had previously testified as an expert in a case involving a pimp suspected of murdering his prostitutes. *See* Tr. XIII at 120.

### A. *Relevance*

█ Appellant asks us to overturn the trial court's determination that Dr. Lee's testimony was relevant to the issues in this case. We decline to do so. Evidence is relevant under Federal Rules of Evidence 401 and 402 if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." FED.R.EVID. 401. In the instant case, we do not agree with appellant's assertion that Dr. Lee's testimony "was of absolutely no probative value to the government in establishing the elements of the offense." Appellant's Brief at 33. In our view, Dr.

Lee's testimony on pimping patterns and the pimp-prostitute relationship might have shed light on critical issues in the case—for example, whether the appellant was in fact a pimp or rather, as Anderson claims, merely a gambler with a flashy lifestyle and a penchant for travel; and whether the government's young witnesses travelled with him quite independently, or as part of a pimp-prostitute relationship. Moreover, Dr. Lee's testimony could have helped the jury to determine the credibility of the government's prostitute-witnesses, which counsel for appellant had sought to undermine on cross-examination by pointing up the inconsistencies in the witnesses' testimonies,[4] and by intimating that they would not have remained with Anderson if he had mistreated them as they claimed. Left unrebutted, such cross-examination could have led the jury to speculate that the mistreatment alleged by the government's witnesses did not actually occur; that the young women had travelled with Anderson quite voluntarily; and that they had not engaged in prostitution at his direction. Because Dr. Lee's testimony had a significant bearing on facts "that could be determinative of [Anderson's] guilt or innocence," and because the trial judge has "wide discretion to admit or exclude evidence where the question is one of relevancy," *United States v. Morgan*, 581 F.2d 933, 936 (D.C.Cir.1978), we hold that the trial court did not abuse its discretion in concluding that the expert testimony of Dr. Lee was relevant. *Cf. United States v. Dunn*, 846 F.2d 761, 763 (D.C.Cir. May 13, 1988) (expert testimony on *modus operandi* of drug distributors was properly admitted); *United States v. Jackson*, 425 F.2d 574, 576–77 (D.C.Cir.1970) (expert testimony on *modus operandi* of pickpockets was properly admitted).

## B. *Undue Prejudice*

■ Appellant contends that even if Dr. Lee's testimony were relevant, it should have been excluded under Rule 403 of the Federal Rules of Evidence because "its probative value [was] substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. Anderson makes two specific claims of prejudice. First, he claims that Dr. Lee's testimony that "flashy clothes, flashy expensive jewelry, and big expensive cars" are "the tools of the pimp's trade," when combined with previously admitted evidence that appellant owned such items, tended "to prove that the defendant is a person of bad character and thus predisposed to commit the crime for which he is on trial." Appellant's Brief at 30 (citing *United States v. Foskey*, 636 F.2d 517, 523 (D.C.Cir.1980)). Second, appellant claims that Dr. Lee's testimony about pimp brutality, and in particular her description of the ways in which the pimp-prostitute relationship usually ends, should have been suppressed because it was "grossly prejudicial" and of "absolutely no probative value." *Id.* at 29–34.

Anderson's claims of prejudice reflect legitimate concerns. Courts have frequently noted that there is often an inherent danger with expert testimony unduly biasing the jury "[b]ecause of its aura of special reliability and trust," *United States v. Amaral*, 488 F.2d 1148 (9th Cir.1973). In this case the risk of unfair prejudice was heightened by the sordid and disturbing nature of Dr. Lee's subject matter. Nor, viewing the trial record as a whole, does it seem that Dr. Lee's testimony was necessary to proof of the government's case or even to the jury's understanding of the way in which pimps operate. Nonetheless, ultimately we cannot conclude that it was reversible error for the district court to admit Dr. Lee's testimony. The government offered a heavy serving of specific factual evidence establishing that Anderson engaged in criminal prostitution operations, all of it unchallenged on appeal. For example, the government's five principal witnesses testified that they were prostitutes, that Anderson was their pimp, that he occasionally beat them, and that he had

---

**4.** *See, e.g.,* Tr. XV at 30–36, 53–54 (testimony of Tina Smart denying the truth of her earlier grand jury testimony to the effect that appellant had made her a prostitute); *id.* at 88–92 (testimony of Shelley Speller disclaiming her earlier statements before the grand jury and asserting that she had been pressured by the government to testify falsely against Anderson).

transported them and other women across state lines as charged in the indictment. *See, e.g.,* Tr. VI at 296–97, 324–28, 534. Given this large quantity of uncontested, particularized evidence against Anderson in the record, it is almost inconceivable that Dr. Lee's general, more attenuated, testimony about the prostitution underworld could have independently affected the jury's verdict. *Cf. United States v. De-Loach,* 654 F.2d 763, 771 (D.C.Cir.1980), *cert. denied,* 450 U.S. 933, 101 S.Ct. 1395, 67 L.Ed.2d 366 (1981) (admission of hearsay evidence was harmless error where the jury had before it nonhearsay testimony to the same effect from three other sources). Under these circumstances, the broad discretion of the trial court in balancing the probative value of the tendered expert testimony evidence against its prejudicial effect, *see United States v. Payne,* 805 F.2d 1062, 1066 (D.C.Cir.1986) *(per curiam),* compels a conclusion that the admission of Dr. Lee's testimony on the pimp-prostitute subculture was, at worst, harmless error.

## CONCLUSION

For the reasons stated above, the decision of the district court is

*Affirmed.*